# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| JOEY L. CROSS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:16-cv-00679-NKL ) |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## ORDER

Plaintiff Joey Cross appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits under Title II of the Social Security Act. The decision is affirmed.

### I. Background

Cross was born in 1972. He alleges he became disabled beginning 10/18/2012. He last worked in heavy construction in 2012. The Administrative Law Judge held a hearing on 6/12/2014 and denied his application on 2/24/2015. The Appeals Council denied his request for review on 4/21/2016.

#### A. Medical history

In July 2012, Cross saw Anthony Gunn, M.D. and complained of severe back pain that started three to four weeks prior to his visit. The pain was exacerbated when lying down and was associated with numbness in Cross's legs. Lumbago and lumbar radicular pain were diagnosed. Dr. Gunn's diagnoses included essential benign HTN, hyperlipidemia, and obesity.

Robert Drisko, M.D. examined Cross in November 2012 after Cross complained of back pain with radiation to both legs. He had neurogenic claudication type symptoms and had failed conservative treatment. Previous x-rays and MRI revealed lateral recess stenosis at L4-L5 and spondylolisthesis at L5-S1. Surgery and EBI bone stimulator were recommended.

Dr. Jenny also examined Cross in November 2012. He had been admitted for lumbar decompression to help treat right lumbar radiculitis. He had daily pain in his low back, right buttock, right hip, and right posterior thigh. His pain was worse with prolonged sitting, standing, walking, and activity. Driving for a period of time caused a "sleep tingling" sensation in his right calf and entire foot. Dr. Jenny's exam revealed normal proprioception and gait, good lumbar ROM with slight flat back upon arising, intact heel and toe walking, decreased reflexes in the upper limbs and knees, and absent reflexes in the ankles.

Cross was hospitalized on November 19, 2012, for decompression and fusion surgery at L4-5 and L5-S1 with bone stimulator insertion. Cross had "some mild anxiety" pre-surgery, but "[n]o significant depression." Cross left the hospital on November 22, 2012.

Dr. Drisko examined Cross on December 4, 2012. He was walking up to half a mile a day, and he was not taking any pain medication. When Dr. Drisko saw Cross on January 3, 2013, Cross's back pain and radicular symptoms were improved. He did have radicular pain in his right forearm into his thumb, which started after his surgery. In addition, his battery was causing him pain, he had discomfort in his anterior thighs, and midline lumbar tenderness was noted.

On January 9, 2013, Dr. Reddig completed an electromyography of the right upper extremity. Findings included right median neuropathy at the wrist, sensory and demyelinating, mild. Cross was examined by Dr. Drisko the next day. The recent EMG revealed right carpal tunnel syndrome. Symptoms in his right hand would wake him up at night, and his hand would go numb when he was carrying his phone or reading a book. He also stated that the battery on the

right side of his back was prominent and painful. He had difficulty getting comfortable in bed, when sitting in a chair, or when riding in a car. Cross also experienced right hip pain. It was very difficult to flex his hip, and he had difficulty going up and down stairs. His pain had worsened since he began walking more since his back surgery. Tenderness was noted in the right lumbar spine at the level of the battery and at the right greater trochanter. A steroid injection was administered to the right wrist.

Dr. Drisko saw Cross on January 31, 2013. He was still having significant low back pain that radiated down his anterior thighs with numbness in both thighs. His pain was worse with activity. Plaintiff also reported right wrist pain that was continuous. A previous wrist injection made his symptoms worse, and the pain radiated up to his shoulder. Exam revealed antalgic gait, right lumbar tenderness (at the level of the battery), and negative straight leg raise. In the right hand, pain was noted in the median nerve distribution. Tinel's, Phalen's, and carpal tunnel compression tests were positive. Right CTS was diagnosed, and surgery was scheduled.

Cross was examined by Dr. Drisko on February 4, 2013. He complained of severe pain in the area of his EBI bone stimulator battery with symptomatic right carpal tunnel. He had been managed with splinting and anti-inflammatories, which had not been effective. The EBI bone stimulator battery was causing significant discomfort, sleep deprivation, and was interfering with rehab. Dr. Drisko performed a right carpal tunnel release and removed the bone stimulator battery. At his follow-up appointment one week later, Cross was doing well with his wrist and back, but he continued to have sharp right hip pain that radiated down his leg.

Dr. Drisko examined Cross on February 14, 2013. He had severe back pain that radiated into his right leg. He was having a significant radicular flare and neurogenic claudication type symptoms. Dr. Drisko noted weakness and pain with extension. Two weeks later, Cross presented with low back pain, right hip pain, and bilateral thigh numbness that had not improved

3

since the previous visit. The right hip pain, which started in his low back, was severe and affected his gait. He appeared to have neurogenic claudication type symptoms. He was in mild distress and had an antalgic gait. Sensation to light touch was decreased over the left L1 and L2 distribution.

Dr. Drisko saw Cross again in March 2013. His pain was in the bilateral anterior lateral thighs. Exam revealed antalgic gait, decreased sensation in the distribution of the lateral femoral cutaneous nerve, normal flexion, and restricted extension. Plaintiff did not want to have any injections, and Dr. Drisko referred him to physical therapy, which he began the following week.

Cross was evaluated by R. Kelling, DPT, on March 26, 2013. Since surgery, Cross had suffered from bilateral hip numbness and tingling with pain in to the right hip. Prolonged walking, prolonged sitting, supine and prone lying, and forward bending exacerbated his pain. He rated his pain 6/10. Cross displayed very slow, guarded movement and increased stance time on the right lower extremity during ambulation. Tenderness was noted in the bilateral lumbar paraspinals, surgical incisions, and right gluteus maximus. Plaintiff attended seven physical therapy appointments from March 26 through April 29, 2013, but failed to report for an additional six appointments.

On April 30, 2013, Cross was examined by Dr. Drisko. He continued to have significant low back pain. He went to physical therapy and stated that it made him feel worse. His pain was continuous, sore, and moderate. Exam revealed antalgic gait, bilateral lumbar tenderness, and restricted lumbar flexion and extension. Cross did heavy construction-type work and Dr. Drisko stated that he was not able to return to that work at that time.

On referral, Dr. Scowcroft examined Cross at a pain clinic on May 8, 2013. He suffered from lower back pain that radiated to the bilateral hips and legs with numbness. He rated his pain 4-5/10, which was aggravated by exercise and lifting. Exam revealed tenderness, normal range of

4

motion, normal muscle strength, and negative straight leg raise. An MRI of the lumbar spine on May 13, 2013 revealed mild spondylosis, which is a general term for degenerative changes due to osteoarthritis. Dr. Scowcroft performed a lumbar epidural steroid injection on May 15 but Cross reported no significant improvement. Plaintiff was examined by Dr. Gunn on May 16, 2013 for severe back pain. His depression was increased due to chronic pain and requested a change in his medication.

Dr. Scowcroft performed insertion of a spinal cord stimulator on June 10, 2013. Dr. Scowcroft examined Cross one week later. His leg pain was more than 70% improved with the spinal cord stimulator, and he wanted implantation of the stimulator. On July 19, 2013, Dr. Scowcroft implanted a spinal cord stimulator and a post-operative discharge instruction indicated that Plaintiff could perform normal activity. Ten days later, Plaintiff was doing well, but the stimulator needed adjustment. He reported back pain but denied swelling, limitation of motion, spasms, and painful joints.

Plaintiff returned to Dr. Scowcroft on September 4, 2013, and reported that the spinal cord stimulation was not working well. The doctor recommended that the stimulator be reprogrammed. Two days later, Anna Wagner, D.O. examined Plaintiff and adjusted his anti-anxiety medication due to his inability to afford the previous medication. Plaintiff reported that his back issues were causing him stress, and psychiatric examination showed full range of mood and affect.

Cross saw Dr. Gunn on November 14, 2013. He had been out of his BP meds for the past two days. He was having problems with increased stress and anxiety and had problems with sleep. He continued to experience severe chronic back pain. The stimulator helped with numbness in his legs, but did not help with back pain. Dr. Gunn adjusted Cross's anxiety medication but reported no positive psychiatric examination findings. Cross reported depression

and anxiety to Dr. Gunn again in March 2014, and again Dr. Gunn adjusted his anxiety medication but reported no positive psychiatric examination findings. In May 2014, Cross reported low back pain to Dr. Gunn and requested pain medication.

Plaintiff was examined by Dr. Nassab, Orthopedics, on June 6, 2014. He presented with left wrist pain and swelling, which came on gradually. He had a constant dull ache that was aggravated by activity, as well as swelling, numbness, and tingling. He also reported neck pain. His hands would fall asleep while driving, and he had numbness and tingling that woke him up at night. Exam of the left wrist revealed positive left carpal tunnel compression and positive Tinel's over the median nerve. X-rays of the left wrist were normal. An EMG of the left arm on June 11, 2014, showed no evidence of neuropathy or cervical radiculopathy.

### B. Expert opinions

Despine Coulis, M.D., a non-examining, non-treating State agency pediatrician, opined based on his review of Cross's record that Cross could lift and carry 10 pounds occasionally, less than 10 pounds frequently; sit 6 hours; stand and/or walk 6 hours; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds.

Joan Singer, Ph.D., a non-examining, non-treating State agency psychologist, opined Plaintiff's depression was "non-severe."

Robert M. Drisko, II, M.D., Plaintiff's treating physician, confirmed Plaintiff could not return to heavy construction work.

James Scowcroft, M.D. noted following implantation of a spinal cord stimulator on July 19, 2013 that Plaintiff's activity could be "normal."

### C. The hearing before the ALJ

Cross testified that he was forty-one years old and lived with his wife, his adult children, his three-year-old granddaughter, and his mother- and father-in-law. He stated that he was able to

cook, shop for groceries, wash dishes, and did laundry with changes in position between tasks. He also used a self-propelled push lawnmower. He went fishing with a friend four or five times since October 2012 and also hunted for deer and turkey four or five times in that time period. He socialized with friends by watching sports occasionally and attended his son's baseball games. He received unemployment benefits through March 2013, but had not looked for work since October 2012.

Cross reported that his low back pain continued to worsen and that he continued to use a spinal cord stimulator. He also experienced numbness and pain in his legs, which had decreased since implantation of the stimulator. He estimated that he could stand twenty-to-thirty minutes at a time, walk one-quarter of a mile, and sit for twenty-to-thirty minutes at a time. He stated that he could help his wife carry groceries, but it "bother[ed]" him. Cross also had problems with his left arm, including prior shoulder surgery, a biceps tear, left thumb surgery, and a recent evaluation of left carpal tunnel syndrome. He had difficulty lifting and experienced numbness and swelling in the left hand and reported numbness and tingling in his right forearm. However, Cross acknowledged that he did not have any problem using his hands for "things like buttoning buttons, zipping up zippers or using utensils to eat." Plaintiff testified that medication "[m]ostly" controlled his symptoms of depression, but he still had some anxiety.

Jennifer Teixeira testified as a vocational expert at the administrative hearing. The ALJ posed to the vocational expert a hypothetical question, which assumed an individual of Plaintiff's age, education, and past work experience. The individual could perform sedentary work, with occasional stooping, kneeling, crouching, crawling, and climbing or ramps and stairs. The individual could not climb ladders, ropes, or scaffolds, but had no limitation of balance. The individual could not work near unprotected heights or moving mechanical machinery, and should not have concentrated exposure to vibration. The individual needed to change position every

7

thirty minutes in a way that did not require significant disruption of work and would result in him being off task for less than ten percent of an eight-hour workday. The vocational expert testified that such an individual could perform the sedentary unskilled positions of order clerk, charge account clerk, document preparer, and lens inserter.

### D. The decision

The ALJ determined Cross suffered from severe impairments of degenerative disc disease of the lumbar spine, obesity, depression, and anxiety and "non-severe" right carpal tunnel syndrome, left wrist pain, hypertension, hyperlipidemia, and GERD. The ALJ found that Plaintiff was not under a "disability" as defined in the Act and concluded Cross has the residual functional capacity:

> [T]o perform a range of sedentary work as defined in 20 CFR 404.1567(a) except the claimant can carry, lift, push and pull 10 pounds occasionally and less than 10 pounds frequently. The claimant can walk and/or stand for two hours and sit for six hours in an eight hour workday. The claimant must be allowed to change positions every 30 minutes. However, this brief position change does not require significant disruption of work. The change would require some time away from the workstation, but that would result in off-task behavior of less than 10 percent of an eight hour workday. The claimant can occasionally climb ramps and stairs, stoop, kneel, crouch and crawl. He can never climb ladders, ropes and scaffolds. The claimant does not have a restriction relating to balancing. The claimant should never work with unprotected heights or moving mechanical machinery. The claimant should not work with concentrated exposure to vibration.

Tr. 19. Relying on vocational expert testimony, the ALJ concluded Cross's impairments would not preclude him from performing work that exists in significant numbers in the national economy, including work as an order clerk, document preparer, and lens inserter. Tr. 23–24.

## II. Discussion

Cross argues the ALJ's RFC is unsupported by opinion evidence and her own findings as

8

to mental and physical impairments. Regarding his mental impairments, Cross argues the decision must be reversed because the RFC does not account for the ALJ's findings of "'severe' impairments of depression and anxiety" including "mild restriction of activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace due to his 'severe' mental health impairments." [Doc. 8, p. 13]. Regarding his physical condition, Cross challenges the opinion evidence and the ALJ's failure to account for Cross's obesity and "non-severe" impairments. *Id.* at 18–19.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Id*. The Court must consider evidence that both supports and detracts from the Commissioner's decision but cannot reverse the decision because substantial evidence also exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If the Court finds that the evidence supports two inconsistent positions and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

Residual functional capacity is what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.")

9

(*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of his limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

### A. Mental impairments

Cross argues the ALJ's RFC is unsupported by her own findings as to Cross's mental impairments. The ALJ acknowledged "severe" depression and anxiety which may "significantly" limit the ability to perform even basic work activities. Tr. 15–16. Because the RFC contains "no limitations whatsoever related to mental impairments," Cross argues that reversal is required. [Doc. 8, p. 13] (citing *Ollila v. Colvin*, 2014 WL 7238128, at *3 (W.D. Mo. Dec. 17, 2014); *Clevenger v. Colvin*, 2016 WL 3911982, at *2 (W.D. Mo. July 15, 2016); *Lafferty v. Astrue*, 559 F.Supp. 2d 993, 1012 (W.D. Mo. 2008)).

Cross contends there is no medical opinion that supports the ALJ's RFC, because Dr. Singer reviewed Cross's records and opinioned that he did suffer from depression but that it was "not severe." Tr. 77. Though the ALJ found this depression more severe than Dr. Singer's analysis, the ALJ did so in reviewing not only Dr. Singer's opinions but also those of other treating physicians. Cross visited Dr. Gunn in September and November 2013 after "having problems with increased stress and anxiety due to financial issues [and] problems with sleep." [Doc. 8, p. 9]. Dr. Wagner examined Cross because "[h]e had been under a lot of stress lately, and he was unable to afford his medications." *Id.* at 10. Visiting Dr. Gunn again in March 2014, Cross's "depression was a bit better on Prozac." *Id.* Cross's assertion that Dr. Singer is the only

10

opinion referencing Plaintiff's mental limitations is not supported by the record; the ALJ had medical support for her finding.

Cross maintains reversal is required because "the ALJ did not account for her own findings" regarding Cross's mental impairments. The Court disagrees. The ALJ specifically stated that the RFC "accounted for [Plaintiff's] depression and pain by allowing [him] to be off task up to ten percent a day." Tr. 23. Cross cites *Porter v. Colvin*, Case 4:14-CV-00813-NKL, Doc. 17, (W.D. Mo. June 22, 2015) to support his argument that, by failing to add additional limitations, the ALJ's decision must be reversed. But the claimant in *Porter* had documented restrictions on her ability to complete tasks in a timely manner. Here, the ALJ's discussion of that finding indicated that Cross denied problems with attention, can follow instructions well, and gets along well with authority figures. Tr. 18. Both Cross and his spouse indicated that he had no problem with attention in forms completed for disability purposes. Tr. 175, 190. The minimal treatment records for anxiety or depression support the ALJ's finding, and Cross has pointed to no objective evidence that would support greater limitations in the RFC related to his mental impairments. *See Pearsall*, 274 F.3d at 1217. Cross sought no specialized mental health treatment and his anxiety and depression were predominantly controlled with medication.

The ALJ properly accounted for Plaintiff's mental impairments in the RFC, and substantial evidence on the record as a whole supports that finding.

### B.  Physical impairments

Cross argues that the ALJ did not properly consider the credibility of his subjective allegations and that the RFC is not based on supporting medical evidence.

#### 1. Weight of opinions

Cross challenges the ALJ's decision giving "great" weight to the opinions of Dr. Coulis as to Plaintiff's functional limitations. [Doc. 8, p. 16]. Plaintiff contends that because Dr. Coulis'

11

specialty is pediatrics, and did not examine or treat Cross, "Dr. Coulis' opinions do not constitute substantial evidence to support the ALJ's decision." *Id.* at 17 (citing *Jenkins v. Apfel*, 196 F.3d 992, 925 (8th Cir. 1999)). It is true that more weight is generally given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. 20 C.F.R. §§ 404.1527, 416.927. However, there is no requirement that a state agency consultant specialize in the relevant area of medicine and "there are circumstances in which relying on a non-treating physician's opinion is proper." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010).

This is one of those circumstances, primarily because Dr. Coulis' opinions are consistent with the evidence of record. Tr. 22. *See Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016) ("The state agency physicians' opinions were consistent with the other medical evidence and it was proper for the ALJ to rely on them, in part, in formulating [claimant's] RFC.") (citing *Stormo v. Barnhart*, 377 F.3d 801, 807-08 (8th Cir. 2004)); *Casey*, 503 F.3d at 694 ("The ALJ did not err in considering the opinion of [the State agency medical consultant] along with the medical evidence as a whole."). None of Cross's treatment providers opined that Plaintiff had limitations consistent with disability besides Dr. Drisko's opinion that Cross was unable to return to heavy construction work, an opinion which the ALJ gave "great weight." Tr. 22, 379, 509. Dr. Drisko did not indicate any other limitations related to Plaintiff's ability to work, which is consistent with other treatment providers and consistent with Dr. Coulis. *See Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006) ("There is no indication in the treatment notes that . . . any of [claimant's] other doctors restricted his activities, or advised him to avoid prolonged standing or sitting."); *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability) (citing *Brown v. Chater*, 87 F.3d 963, 964-65 (8th Cir. 1996)). The ALJ also gave great weight to a statement

12

from Dr. Scowcroft, who treated Cross and indicated that Cross was released to "normal" activity after implantation of the spinal cord stimulator.

The ALJ considered Cross's reported activities of daily living and his subjective allegations of debilitating limitations in determining Cross's RFC. Tr. 22-23. In forms completed for disability purposes, Cross and his spouse reported that he helped with housework, cooked meals, shopped for groceries, mowed the lawn using a riding mower, went fishing, and attended his son's baseball games. Tr. 170–75, 186–90. At the administrative hearing, Cross repeated that he was able to cook, shop for groceries, wash dishes, do laundry, and mowed the lawn using a self-propelled push lawnmower. Tr. 55, 57. He also reported that he had gone fishing with a friend four or five times since his alleged onset date and had also gone deer and turkey hunting four or five times in the same time period. Tr. 58.

Cross had also received unemployment benefits through March 2013. Tr. 40. *See Milam*, 794 F.3d at 984 ("In seeking and obtaining such unemployment benefits, Milam evinced a willingness and ability to work, which contradicts her claim of disabling pain.") (citing *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991)); *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) ("Applying for unemployment benefits adversely affects credibility, although it is not conclusive, because an unemployment applicant 'must hold himself out as available, willing and able to work.'"). The ALJ properly considered that these reported activities were not consistent with Cross's allegations of debilitating back and leg pain.

### 2. Obesity

Cross also maintains the ALJ's RFC is unsupported because it did not include limitations based on his obesity. [Doc. 8, p. 17]. The ALJ is required to assess the effect obesity has on an individual's ability to perform routine movement and physical activity within the work environment and explain how she reached any conclusions on whether obesity caused any

13

physical or mental limitations. SSR 02-1p, paragraph 8. However, Plaintiff has the burden of proving the limitations in his RFC and points to no specific limitation that the ALJ did not include due to his obesity. *See Mabry*, 815 F.3d at 390; *see also Young*, 221 F.3d at 1069 n.5 ("We reiterate that RFC is determined at step four, where the burden of proof rests with the claimant.") (citations omitted). The ALJ considered Cross's obesity in combination with his other impairments. Tr. 16-23. The ALJ is not required to attribute specific limitations to a specific impairment because there is no requirement that an RFC be supported by a specific medical opinion. *See Meyers v. Colvin,* 721 F.3d 526, 527 (8th Cir. 2013), and *Chapo v. Astrue,* 682 F.3d 1285, 1288089 (10th Cir. 2012).

SSR 02-01p outlines various factors and limitations that may be relevant to a claimant's diagnosis of obesity, but does not indicate that every individual with a diagnosis of obesity will have all or any of the possible limitations enumerated in the SSR. *See* SSR 02-01p, 2002 WL 34686281 (S.S.A. 2002). The ALJ properly considered the combination of Cross's alleged impairments throughout the sequential evaluation process. Cross points to no evidence that would support a finding that his obesity resulted in greater limitations than those already included in the RFC, which includes limitations for standing, sitting, and movement. *See Stormo*, 377 F.3d at 806 ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five.").

### 3. Non-severe impairments

Plaintiff argues that the ALJ failed to include limitations related to his non-severe impairments. After finding Plaintiff's severe impairments at step two, the ALJ at later steps, "consider[s] the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. However, this consideration does not mean that the ALJ must include limitations in

the RFC directly and specifically related to the non-severe impairments. This requirement is consistent with the Eight Circuit holdings that the ALJ must consider all of the evidence of record as a whole in making the RFC finding. *See Wildman*, 596 F.3d at 969.

Here, the ALJ's formulation of the RFC at step four, for sedentary work as defined in 20 CFR § 404.1567(a), was based on substantial evidence on the whole record, including medical evidence. Cross's medical records show he has had CTs, MRIs, and x-rays which often revealed "unremarkable," "normal," "mild," "relatively mild," or "mild or moderate" results. Several physical examinations by different physicians during the relevant time period revealed normal or negative findings, including normal muscle tone; normal reflexes; and ability to walk with a normal gait, without a limp, and without the use of an assistive device.

No physician ordered Cross to refrain from physical activity during the relevant time period. To the contrary, Dr. Drisko referred Cross to physical therapy. Although Cross notes that the injunctions and therapy added to his pain, there is still no evidence in the record of a medical provider advising Cross to refrain from physical activity and ample evidence of providers recommending it. The therapist noted that Cross was able to participate in recreational activities despite his complaints of pain. Tr. 387. A lack of significant functional restrictions imposed by treatment providers is inconsistent with allegations of disabling limitations. *Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003).

### 4. Consultative examination

Finally, Cross contends that because there is no medical opinion specifically supporting the RFC limitations that the ALJ was required to obtain a consultative examination. [Doc. 8, pp. 15–16]. However, the RFC need not be based on a specific medical opinion and is instead based on review of the evidence as a whole: "'[I]n evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively . . . . Even though the RFC assessment draws from

15

medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'" *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007); *see also Stallings v. Colvin*, 14-CV-03273-MDH, 2015 WL 1781407 at *3 (W.D. Mo. April 20, 2015) ("Eighth Circuit case law reveals that an ALJ can appropriately determine a claimant's RFC without a specific medical opinion so long as there is sufficient medical evidence in the record.") (citing *Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005)); *Peterson v. Colvin*, No. 13-0329-CV-W-ODS, 2013 WL 6237868 at *4 (W.D. Mo. Dec. 3, 2013) (noting that "Plaintiff overstates the law by contending there must be medical evidence that precisely supports each component of the RFC.") (citing *Cox*, 495 F.3d at 619).

In SSR 96-5p, the Commissioner noted a crucial distinction relevant here: "A medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge," but "an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all other evidence in the case record about what an individual can do despite his or her impairment(s)." SSR 96-5p, 1996 WL 374184, at *4 (S.S.A. 1996). Requiring the ALJ to adopt a medical source's opinion on the issue of RFC "would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *See Id.* at *2.

When the evidence is insufficient to make a determination about disability, the Agency may request additional records, obtain a consultative examination, ask the claimant for more information, or recontact a medical source. *See* 20 C.F.R. § 404.1520b(c). But, as here, "when there is no indication that the ALJ felt unable to make the assessment [she] did and [her] conclusion is supported by substantial evidence," the ALJ did not need to further develop the record. The RFC is a determination based on all the record evidence, not just the medical opinion evidence. *See Miller*, 784 F.3d at 479; *Wildman*, 596 F.3d at 969; *see also* 20 C.F.R. § 404.1545.

16

The RFC formulation is a part of the medical portion of a disability adjudication—as opposed to the vocational portion—but it is not based only on "medical" evidence. Rather, an ALJ has the duty to formulate the RFC based on all the relevant, credible evidence of record. *See Perks*, 687 F.3d at 1092 ("'Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'").

Cross had a fair hearing and full administrative consideration in accordance with applicable statutes and regulations. Substantial evidence on the record as a whole supports the Commissioner's decision.

### III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: February 3, 2017  
Jefferson City, Missouri